# United States District Court Northern
# District of Illinois Eastern Division

JOHN R. SMITH,
Plaintiff, v.

V&P Motors LLC;
MANHEIM AUCTIONS, INC.;
ROHR-GURNEE MOTORS, INC. d/b/a GURNEE VOLKSWAGEN; d/b/a ROHRMAN AUTOMOTIVE GROUP;
RYAN V. ROHRMAN;
NEBOJSA "NEBI" DENIC;
ROCCO PERRY; CRYSTAL ZABA; DAVID LaBAHN; TYLER STEIN; Defendants.
Case No. _____
Judge: _____
Jury Trial Demanded

RECEIVED

DEC 12 2025

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1:25-cv-15139
Judge Steven C. Seeger
Magistrate Judge Jeannice W. Appenteng
Cat 2/Random

## I. COMPLAINT

Plaintiff John R. Smith ("Plaintiff") brings this action against the above-named Defendants for violations of Illinois and California consumer-protection law, common-law fraud, civil conspiracy, deceptive business practices, breach of warranty, and related claims arising from the sale of a dangerously repaired total-loss Tesla Model 3 whose salvage history was concealed through improper title laundering and the systematic insertion of unauthorized "dealer service plans" into customer purchases.

Plaintiff alleges as follows:

1. This action arises from a multi-state enterprise conducting patterns of mail/wire fraud in title washing scheme involving the illegal reconstruction, concealment, and interstate sale of a structurally unsafe total-loss Tesla vehicle, originating in California and ultimately sold to Plaintiff in Illinois.

2. The fraud began when V&P Motors LLC unlawfully rebuilt and concealed the total-loss status of the vehicle.

3. The vehicle was then transferred through Manheim Auctions, Inc., a licensed California automotive dealer wholesaler in Anaheim, California which failed to comply with mandatory California salvage-disclosure laws and knowingly introduced an unsafe, structurally compromised vehicle into the stream of interstate commerce.

4. The vehicle was purchased by Rohrman Automotive Group and its dealership Gurnee Volkswagen, who continued the concealment, falsified disclosures, and engaged in systematic sales and warranty fraud in the instant case and other publicly disclosed cases.

5. Plaintiff repeatedly attempted to notify high-level corporate officials, including CEO Ryan V. Rohrman, but all warnings were ignored.

6. The misconduct resulted in catastrophic financial loss, homelessness, emotional distress, and ongoing safety risks to Plaintiff and the public at large.

7. Plaintiff seeks compensatory, statutory, consequential, and punitive damages of not less than $300,000.

## II. JURISDICTION AND VENUE

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claim under the Magnuson–Moss Warranty Act, 15 U.S.C. § 2301 et seq. and Violation of RICO, 18 U.S.C. §1962(c) & (d) (enterprise conducting pattern of mail/wire fraud in title washing)

9. The Court has supplemental jurisdiction over Plaintiff's Illinois and California state-law claims pursuant to 28 U.S.C. § 1367(a), because such claims arise from the same nucleus of operative facts.

10. Venue is proper in this District under 28 U.S.C. § 1391(b), because a substantial part of the events or omissions giving rise to this action occurred in this District, and several Defendants reside or conduct business here.

## III. PARTIES

### A. Corporate Defendants

11. V&P Motors LLC is a California limited liability company located at 8332 Tampa Avenue, Northridge, CA 91324.
12. Manheim Auctions, Inc. is a national vehicle dealer only auction corporation with major operations in Anaheim, California, and is part of Cox Automotive.
13. Rohrman Automotive Group is a large multi-state dealership enterprise headquartered in Illinois.
14. Rohr-Gurnee Motors, Inc., doing business as Gurnee Volkswagen, is an Illinois corporation operating a franchise dealership in Gurnee, Illinois under the Rohrman Automotive Group dba.

### B. Individual Defendants

15. Ryan V. Rohrman is the Chief Executive Officer of Rohrman Automotive Group and exercised final decision-making authority over corporate operations and dealership compliance.
16. Nebojsa "Nebi" Denic was the General Sales Manager at Gurnee Volkswagen.

17. Rocco Perry was the General Manager at Gurnee Volkswagen.

18. Crystal Zaba is a corporate representative responsible for handling fraud complaints and BBB matters.

19. David LaBahn was a finance manager at Gurnee Volkswagen.

20. Tyler Stein is a salesperson at Gurnee Volkswagen.

21. All individual defendants acted within the scope of their authority and/or under color of corporate authority. Should other defendants be discovered they to are sued individually as well under the alter ego doctrine

### A. Total-Loss Declaration and Salvage Chain (Hertz → Copart → V&P Motors → Manheim → Rohrman Group)

20. On February 21, 2023, Hertz Corporation declared the subject Tesla Model 3 a total loss following a front-end collision.

21. Hertz calculated repair costs exceeding $24,000, including A-frame distortion, structural displacement, and major front-end component destruction.

22. Hertz salvage expert documented that the vehicle was "unsafe for customer repair" and marked it for salvage disposal. 21 and 22 satisfies Illinois Vehicle Code (625 ILCS 5/3-117.1, 5/3-117.3) (salvage designation).

23. Hertz authorized the vehicle for transmission to Copart California a licensed national salvage auction, for destruction or part-out.

24. Hertz's disposition file confirmed that the vehicle was not authorized to re-enter the retail market as a whole vehicle which satisfies Illinois salvage designation laws.

25. The Tesla arrived at a Copart facility in California, where Copart performed its standard salvage intake process.

26. Copart photographed the vehicle extensively, capturing dozens of images showing catastrophic structural damage, including crushed A-pillars, missing crash members, broken energy absorbers, bent rails, and displaced hood and fender geometry.

27. Copart assigned the vehicle a salvage designation and auctioned it through its online platform.

28. V&P Motors LLC, a shell buyer with a history of cash purchases, purchased the wrecked Tesla for approximately $14,000.

29. On information and belief, V&P Motors paid cash and performed substandard, non OEM ("aftermarket") structural repairs outside of certified collision protocols.

30. The improper repairs included welded frame patches, aftermarket bumper carriers, mismatched paint materials, improper radar mounting, and non-factory hood alignment.

31. These repairs rendered the vehicle structurally unsafe in a pattern that revoked its dealer license.

### B. Manheim's Failure to Disclose Total-Loss History

32. After repairs, V&P Motors transported the vehicle to Manheim Anaheim California operated by Cox Automotive, Inc.

33. Manheim processed the vehicle into its dealer-only auction stream.

34. Despite having access to NMVTIS accident data, VIN flags, and Copart-sourced auction history, Manheim failed to disclose the vehicle's prior total-loss status.

35. Manheim listed the vehicle without salvage warning, structural damage disclosure, or prior total-loss notation in a pattern and practice of title washing.

36. Manheim permitted the vehicle to be sold to downstream dealers "AS IF" it were a clean-title car.

37. This omission enabled the dangerous vehicle to re-enter the retail market.

### C. Rohrman Automotive Group's Failure to Perform Legally Required Due Diligence

38. Rohrman Automotive Group is the name for the parent company, a family of dealerships that includes the Gurnee Volkswagen dealership acquired the vehicle from Manheim.

39. Illinois law requires dealers to perform reasonable due diligence, including VIN history review and structural safety inspection.

40. A basic Google search of the VIN revealed all Copart salvage images and the total loss designation.

41. Rohrman Automotive Group either failed to conduct even the lawful due diligence and/or intentionally concealed the damage as it did on a routine basis according to public reporting. Both acts are illegal under Illinois law.

42. The dealership listed the vehicle for sale as:
    - "Clean Title"
    - "No Catastrophic Accidents Reported"
    - "Flawless Condition"

- "Mechanically Perfect"

- "Still Under Tesla Warranty"

43. All these representations were false and are a well documented regular pattern and practice in the Rohrman Automotive Group of used vehicle dealers.

### D. The Unauthorized Dealer Service Plan Scheme

43. In addition to salvage concealment, the dealership employees operated an internal scheme to insert unauthorized "dealer service plans" into customer deals commonly known as a "DSP Scam."
44. Plaintiff's contract was stuffed with four DSP's totaling $6,274 in unwanted add-on products.
45. Sales staff managers would add these products without the customer's knowledge or consent, then send the contract to finance.
46. Finance manager David LaBahn confirmed that this was a routine practice pushed by sales managers.
47. General Sales Manager Nebi Denic, based on consumer complaints and manager admissions, coordinated the add-on program.
48. Over several months Plaintiff repeatedly requested removal of these add-ons, but the dealership and Ryan V Rohrman, CEO directly ignored him.

### E. Plaintiff's Purchase Experience

50. On March 17, 2023, Plaintiff purchased the Tesla from Gurnee Volkswagen.
51. Plaintiff asked whether the vehicle had ever been in an accident; Tyler Stein replied, "No, minor front bumper damage on CARFAX, no salvage issues. We would never sell a salvaged car."
52. Plaintiff relied on these statements when entering the transaction.
53. At no time did Stein, Denic, LaBahn, Perry, or any other employee disclose:
    - prior total-loss status,
    - Copart salvage history,
    - structural damage, • non-OEM reconstruction,
    - lost manufacturers warranty coverage.

54. Plaintiff was presented with a contract containing concealed add-on plans he never agreed to.

55. The finance manager electronically signed the sales contract with plaintiffs signature and initials then placed it in the glove box as plaintiff had to rush to a critical doctor's appointment.

### F. Post-Sale Discovery of Structural Danger

56. Immediately Plaintiff experienced steering vibration, brake noise, alignment pulling, and loss of range in the self driving technology.

57. Plaintiff brought the vehicle to a Tesla-approved collision center, The Ultimate Paint Shop for a minor accident to the fender.

58. Tesla-certified technicians concluded, photographed and analyzed the vehicle.
    - had major structural repair,
    - was improperly rebuilt making the technology obsolete.
    - was unsafe to drive,
    - should never have been sold,
    - voided its Tesla warranties including access to Tesla Superchargers.

59. The shop confirmed they routinely flag dangerous salvage vehicles but found no record of Rohrman Automotive Group dealers or Manheim auction performing such checks.

### G. Systemic Concealment by Dealership Management

60. Plaintiff attempted to contact Gurnee VW and Rohrman Automotive Group CEO Ryan Rohrman for several months.

61. He called Stein, Perry and Nemic over 20 times but received no response.

62. He emailed Perry, Nemic and Corporate - no response.

63. He sent written dispute notice to Perry, Nemic and Rohrman but no response.

64. CEO Rohrman, General Manager Rocco Perry and General Sales Manager Nemic ignored every contact attempt including Illinois Attorney General's Fraud Unit

65. Corporate HR representative Crystal Zaba admitted by email (BBB) that Plaintiff had a valid fraud complaint and stated all employees have been notified and retrained.

66. Zaba ordered Perry to resolve the issue (DSP's) and told him to "cut a hard money check."

67. Perry called Plaintiff one time, acting nervous, promising a fix.

68. Perry referred plaintiff to the Rohrman website dedicated to refunding fraudulent DSPs.
69. During BBB arbitration, Zaba concealed the salvage file despite having it in her possession. Instead, Plaintiff received an email from the corporate attorney Levison blaming the plaintiff for signing the CARFAX report (CARFAX does not provide auction data).

### H. Discovery of Salvage History and Internet Evidence

70. Plaintiff independently discovered the salvage history by performing a basic Google search of the VIN.
71. Copart images showed every detail of the catastrophic impact, confirming the vehicle was totaled.
72. The VIN also matched Hertz's total-loss database entry.
73. Plaintiff learned the vehicle had been sold at least three times across state lines before reaching Rohrman.
74. This pattern is consistent with known title-washing practices.

### I. Damages and Harm to Plaintiff

75. Plaintiff paid full retail price for a worthless vehicle specifically to use for ride sharing.
76. He incurred thousands in inspection costs and lost earnings over 24 months due to unsafe driving conditions e.g. HVAC failures.
77. On February 1, 2025, the Tesla became his shelter due to homelessness; structural defects made it dangerous even to live in e.g. no AC or heating due to climate control failures.
78. Plaintiff was financially devastated, leading to his bankruptcy filing. Discharged Nov 17, 2025.
79. Plaintiff was already a disabled Army Veteran suffering from two ADA disabilities (PTSD and under the care of a spinal surgeon). The distress, physical risk, and loss of income was devastating.
80. Plaintiff's damages exceed $ 300,000 including punitive damages and future damage compensation.

## COUNT I — VIOLATION OF THE ILLINOIS CONSUMER FRAUD & DECEPTIVE BUSINESS PRACTICES ACT

(815 ILCS 505/1 et seq.)

81. Plaintiff incorporates ¶1–80 as though fully restated herein.
82. Defendants engaged in "unfair or deceptive acts or practices" in trade or commerce.

83. Defendants misrepresented the vehicle as clean-title, accident-free, structurally sound, and warrantied.
84. Defendants omitted material facts including the vehicle's prior total-loss status, structural compromise, and voided warranty.
85. Defendants inserted unauthorized service plans totaling $6,274 into the sales contract without Plaintiff's consent.
86. These omissions and misrepresentations were intended to induce Plaintiff to purchase the vehicle.
87. Plaintiff relied on these misrepresentations when purchasing the Tesla.
88. Defendants' conduct was immoral, unethical, oppressive, and unscrupulous.
89. Plaintiff has suffered actual damages including economic loss, loss of use, inspection costs, and diminished property value.
90. Defendants' conduct was willful and malicious.
91. Plaintiff is entitled to compensatory damages, statutory damages, and attorney's fees under ICFA.

## COUNT II — COMMON-LAW FRAUD

92. Plaintiff incorporates ¶1–91.
93. Defendants knowingly made false statements of material fact.
94. These included explicit statements that the vehicle was accident-free, safe, warrantied, and structurally sound.
95. Defendants also represented the contract as accurate despite stuffing unauthorized add-ons into the agreement.
96. Defendants concealed the salvage and total-loss history.
97. Defendants knew these statements were false at the time they were made.
98. Defendants intended Plaintiff to rely on their false statements to induce purchase.
99. Plaintiff justifiably relied on Defendants' representations.
100. Plaintiff suffered injury as a direct result of this fraud.
101. Plaintiff is entitled to rescission, restitution, and punitive damages.

## COUNT III — FRAUDULENT CONCEALMENT

102. Plaintiff incorporates ¶1–101.

103. Defendants possessed exclusive knowledge of the vehicle's salvage history and structural damage.
104. Defendants had a duty to disclose these facts because:
105. they related to a latent defect not discoverable by ordinary inspection,
106. Defendants had superior knowledge,
107. Plaintiff made direct inquiries about vehicle history.
108. Defendants intentionally concealed these facts.
109. Defendants further concealed the fact that the Tesla's factory warranty was void.
110. General Manager Perry and Corporate Agent Zaba knowingly withheld salvage documentation during BBB arbitration.

> 108. Plaintiff relied on Defendants' concealment to his detriment.
> 109. Plaintiff suffered damages including purchase price, loss of earnings, repair expenses, and safety risks.
> 110. Defendants' conduct was fraudulent, malicious, and done in conscious disregard for Plaintiff's rights.

## COUNT IV — NEGLIGENT MISREPRESENTATION

111. Plaintiff incorporates ¶1–110.
112. Defendants, in the course of their business, supplied false information for Plaintiff's guidance in a sales transaction.
113. These misrepresentations included the vehicle's condition, history, warranty status, and contract contents.
114. Defendants failed to exercise reasonable care in communicating accurate information.
115. Plaintiff justifiably relied on Defendants' representations.
116. Plaintiff suffered damages as a direct and proximate result.
117. Defendants are liable for negligent misrepresentation.

## COUNT V — BREACH OF WARRANTY / MAGNUSON-MOSS WARRANTY ACT

(15 U.S.C. § 2301 et seq.)

118. Plaintiff incorporates ¶1–117.

119. Defendants advertised the vehicle as carrying remaining Tesla factory warranty.
120. This representation formed a written warranty under the MMWA.
121. The Tesla's warranty was void due to salvage designation and structural compromise.
122. Defendants breached the implied warranty of merchantability.
123. A structurally unsafe, improperly repaired, total-loss vehicle is not "fit for ordinary purposes."
124. Plaintiff was entitled to receive a safe, operable vehicle fit for transportation.
125. Defendants violated the Magnuson-Moss Warranty Act and the Illinois UCC.
126. Plaintiff is entitled to damages, revocation of acceptance, and attorney's fees.

## COUNT VI — CIVIL CONSPIRACY

127. Plaintiff incorporates ¶1–126.
128. Defendants knowingly agreed, explicitly or implicitly, to participate in a coordinated scheme to defraud consumers.
129. Overt acts included:
    - acquiring salvage vehicles through title-washing channels,
    - concealing structural history,
    - inserting unauthorized service plans,
    - withholding documents from Plaintiff,
    - ignoring complaint attempts,
    - presenting false information during arbitration.
130. Each Defendant performed one or more overt acts in furtherance of the conspiracy.
131. The conspiracy directly caused Plaintiff's damages.
132. Plaintiff is entitled to damages jointly and severally.

## COUNT VII — NEGLIGENT SUPERVISION
(Corporate Defendants)

133. Plaintiff incorporates ¶1–132.
134. Corporate Defendants owed a duty to properly supervise sales, finance, arbitration, and vehicle acquisition personnel.
135. Corporate Defendants failed to provide proper training, oversight, and enforcement of compliance policies.

136. The dealership had a known pattern of fraud complaints involving GSM Denic and others.
137. Corporate Defendants permitted systemic misconduct to continue.
138. This failure directly enabled the fraud that harmed Plaintiff.
139. Corporate Defendants are liable for negligent supervision.

## COUNT VIII — NEGLIGENCE (MANHEIM AUCTIONS / COX AUTOMOTIVE)

140. Plaintiff incorporates ¶1–139.
141. Manheim owed a duty of reasonable care when processing vehicles entering its auction stream.
142. Manheim had access to NMVTIS, Copart salvage data, and VIN-linked total-loss flags.
143. Manheim breached its duty by failing to disclose the Tesla's salvage history.
144. Manheim's failure materially contributed to the vehicle's resale as a clean-title car.
145. Plaintiff suffered damages as a result.146. Manheim is liable for negligence.

## COUNT IX — PUNITIVE DAMAGES

147. Plaintiff incorporates ¶1–146.
148. Defendants' conduct was willful, malicious, and executed with reckless disregard for human safety.
149. Defendants engaged in intentional fraud involving concealment of a dangerously repaired vehicle.
150. Punitive damages are appropriate to deter future misconduct.
151. Plaintiff seeks punitive damages against each Defendant according to their individual roles.

**COUNT X – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)18 U.S.C. § 1962(c) (Against V&P Motors, Manhiem Auction, Rohrman Automotive Group, Rohr-Gurnee Motors, Inc. d/b/a Gurnee Volkswagen, Ryan V. Rohrman, Nebojsa "Nebi" Denic, Rocco Perry, Crystal Zaba, David LaBahn, and Tyler Stein)**

152. Incorporates by reference all preceding paragraphs as if fully set forth herein.
153. At all relevant times, Defendants V&P Motors, Manhiem, Rohrman Automotive Group, Rohr-Gurnee Motors, Inc. d/b/a Gurnee Volkswagen, Ryan V. Rohrman, Nebojsa "Nebi"

Denic, Rocco Perry, Crystal Zaba, David LaBahn, and Tyler Stein (collectively, the "V&P Motors-Manhiem-Rohrman RICO Defendants") constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (Salvage-Fraud Enterprise"). The V&P Motors-Manhiem-Rohrman Salvage-Fraud Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which it engaged: a hierarchy consisting of CEO Ryan V. Rohrman at the top, General Manager Rocco Perry and General Sales Manager Nebojsa Denic directing day-to-day dealership operations, Finance Manager David LaBahn executing fraudulent contracts, Salesperson Tyler Stein making false oral representations to customers, and Corporate Representative Crystal Zaba handling complaint concealment and arbitration responses.

154. The V&P MOTORS-MANHIEM- Rohrman Salvage-Fraud and Title Washing Enterprise had the common purpose of maximizing profits by (a) acquiring total-loss/salvage vehicles at deep discounts through wholesale auctions, (b) concealing their salvage history from retail customers, (c) misrepresenting the vehicles as clean-title and warrantied, (d) systematically inserting unauthorized "dealer service plans" and other add-on products into retail installment contracts without customer knowledge or consent at the dealer level, and (e) stonewalling postsale complaints to avoid refunds or rescission.

155. This common purpose and the ongoing nature of the Enterprise is evidenced by, among other things:

- Multiple public consumer complaints and BBB records showing the same pattern at Gurnee Volkswagen and other Rohrman dealerships;
- Admissions by Crystal Zaba in BBB correspondence that employees were "retrained" after similar fraud complaints;
- The existence of a dedicated Rohrman corporate website for refunding fraudulent dealer service plans; and
- Internal communications directing staff to conceal salvage history and to refuse removal of unauthorized add-ons including concealed title chains.

156. Between at least February 2023 and the present, the V&P MOTORS-MANHIEM-Rohrman RICO Defendants conducted and participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity consisting of multiple acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), including but not limited to:

a. On or about March 17, 2023, use of the wires to transmit the fraudulent Retail Installment Sale Contract containing $6,274 in unauthorized add-on products from Gurnee Volkswagen to the lender/assignee;

b. Multiple uses of the mails and wires to transmit false Carfax reports, window stickers, and "We Owe" forms representing the subject Tesla as clean-title and free of structural damage;

c. Use of interstate wires to access and manipulate NMVTIS and auction data to hide the vehicle's salvage history;

d. Multiple uses of interstate email and telephone communications to falsely assure Plaintiff (and other consumers) that the vehicle had never been totaled or structurally damaged;

e. Use of the mails and wires in 2024–2025 to transmit false statements to the Better Business Bureau and Plaintiff denying the existence of salvage documentation that was in Defendants' possession.

153. Each of these acts was indictable under 18 U.S.C. §§ 1341 and 1343 and was committed for the purpose of executing and concealing the scheme to defraud retail car buyers.

154. The Rohrman RICO Defendants' pattern of racketeering activity was continuous: it spanned at least two years, involved multiple victims (as shown by public complaints), and remains ongoing, thereby satisfying both closed- and open-ended continuity under Seventh Circuit law

155. Plaintiff was directly injured in his business and property the operation of the Rohrman Salvage-Fraud Enterprise. Specifically, Plaintiff was induced to pay approximately $72,000 (including interest at 18.9%) for a structurally unsafe, total-loss vehicle worth less than $14,000, suffered the stuffing of $6,274 in unauthorized products at 84 months of 18.9% interest, lost the entire use of the vehicle as a ride share asset, and incurred substantial out-of-pocket losses and lost earnings. Plaintiffs mental and physical health issues were inflamed and progressed. 156.

Plaintiff's injuries were proximately caused by, and are the direct and foreseeable result of, the V&P MOTORS-MANHIEM-Rohrman RICO Defendants' violations of Violation of 18 U.S.C. §1962(c)–(d) (Civil RICO – pattern of mail/wire fraud in interstate title-washing scheme).

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment against the V&P MOTORS-MANHIEM-Rohrman RICO Defendants, jointly and severally, for threefold the damages he sustains pursuant to 18 U.S.C. § 1964(c), plus costs and reasonable attorney's fees, and for such other relief as the Court believes just and proper.

**PRAYER FOR RELIEF**

157. Plaintiff requests judgment in his favor and against all Defendants jointly and severally for:
    - compensatory damages;
    - punitive damages;
    - rescission of the sales contract;
    - restitution and refund;
    - attorney's fees and costs;
    - exceeding $300,000.00
    - any further relief deemed just and proper.

**JURY DEMAND**

158. Plaintiff demands trial by jury on all issues so triable.

Respectfully submitted,

*/s/ John R. Smith/*

/s/ John R. Smith
John R. Smith
Pro Se Plaintiff
1400 Patriot Blvd., Unit 291
Glenview, Illinois 60025
Phone: 480-486-2902
Email: zuika@usa.com

Date: 12/08/2025

---

I, John R. Smith, hereby declare under penalty of perjury that the statements contained in this Complaint are true and correct to the best of my knowledge and belief.

Executed on this 9th day of December 2025.

/s/ John R. Smith
John R. Smith

Under 28 U.S.C. § 1915 and Federal Rule of Civil Procedure 4(c)(3):
If Plaintiff's IFP application is granted, the U.S. Marshals Service must affect service on each defendant at Plaintiff's direction.
Summonses and USM-285 forms will be provided as part of the filing packet.
Plaintiff respectfully requests that this Court enter judgment in his favor, award the relief described above, and grant any other or further relief the Court deems just and proper